[Civ. No. 18036.   First Dist., Div. One.   Mar. 26, 1959.]

NAPAVALE, INC. (a Corporation) et al., Appellants, v. UNITED NATIONAL INDEMNITY COMPANY (a Corporation) et al., Respondents.

Lange & Rockwell for Appellants.

James C. Calkins for Respondents.

HANSON, J. pro tem.*—The question presented for decision is whether the automobile insurance policy issued by defendant indemnity company provided coverage for the loss by theft of a Golden Goddess Cadillac which had allegedly been purchased by plaintiff-appellant.

The said policy is a so-called "blanket insurance policy" which, when issued, covered certain automobiles specifically scheduled therein against loss by theft. The Golden Goddess Cadillac was not one of the scheduled automobiles. However, the policy contained an automatic coverage provision for newly acquired automobiles. Coverage was automatically to attach to "*an* automobile, *ownership of which is acquired by the named insured who is the owner of the described automobile* [emphasis added], if the named insured notifies the company within 30 days following the date of its delivery to him, and if either it replaces an automobile described in this policy or the company insures all automobiles owned by the named insured at such delivery date. . . . The named insured shall pay any additional premium required because of the application of the insurance to such newly acquired automobile. . . ."

The policy expressly provides and declares that it insures the *owner* of the automobiles listed in the policy and, in addition, the policy declares that the named insured is *the sole owner* thereof except with respect to bailment leases, conditional sales, mortgages or other encumbrances. As the policy is written in the singular, i.e., "named insured," we will for convenience refer to Mrs. Roth alone as being the named insured and ignore the two corporations which are designated as named insureds in the policy along with Mrs. Roth.

We now turn to a recital of the factual background which gave rise to the controversy before us. The plaintiff, Mrs. Roth, is the owner of five different corporations and she

---

*Assigned by Chairman of Judicial Council.

or the corporations owned a total of 11 automobiles at the time the policy was issued. While the policy was in force, Mrs. Roth learned that she could purchase automobiles, particularly Cadillacs, at what is known as the "fleet price" through a Mr. Leonard. She thereupon met Mr. Leonard and, as a result, agreed to purchase a new Cadillac for approximately $1,000 to $1,500 below the regular price and gave him a check for $250 as a down payment. Mrs. Roth testified that Leonard on Saturday, April 2, 1955, drove the car to her home for delivery; and that she advised Mr. Leonard that she did not have any blank checks on her Napavale bank but would give him her check thereon for the balance of $4,450 on Monday, April 4, 1955, when he called at her office; that he thereupon delivered the Cadillac to her along with the keys, and on Monday she gave him the check for $4,450, payable to his order. Mrs. Roth further testified that there was a rattle in the right door window and hence Leonard suggested he take the car to a Cadillac dealer to have the rattle eliminated; that she turned the Cadillac over to him along with the keys for that purpose. Whether this occurred on Saturday or on Monday following is not clear from her testimony, as she testified both ways. At all events she never saw the Cadillac again.

She testified that in her conversation with Leonard on Monday, April 4, 1955, she asked Leonard for a bill of sale, but did not receive one as Leonard stated that none could be given on a "fleet deal," but that he told her the Cadillac was registered in the name of Marsha Estates, Inc., and that the pink slip would come to him thus registered and he would then endorse it to her. She testified she never received a pink slip or any other papers of ownership or anything to indicate she was the owner of the Golden Goddess Cadillac. The automobile, at the time of the alleged purchase by plaintiff Roth was registered, as she had been told by Leonard, in the name of Marsha Estates, Inc., and, so far as it appears, that corporation never parted with title until it transferred the pink slip about a year later to a third party. Leonard, it appears, had no title to the car and no authority from Marsha Estates, Inc., to sell or transfer the automobile, and the court below so found. The automobile was never located after the transaction in question. The trial judge found for the defendant; the material findings are as follows: "[T]he court finds that Robert C. Leonard did purport to sell a certain 1955 Cadillac automobile, engine No. 556 262 409 to plaintiff for an agreed price of $4,750; that

plaintiff did pay said Leonard said $4,750 and did receive physical possession [of the] vehicle for several days; that it is the further finding of this court that Robert C. Leonard did not deliver to plaintiff any bill of sale nor did he deliver any certificate of ownership to plaintiff; that none of the provisions of the Vehicle Code pertaining to transfer of title were complied with by said parties; that title to said vehicle at the time of said transaction was in Marcia [sic] Estates, Inc. as evidenced by certified copy of documents of the Department of Motor Vehicles of the State of California; that at the time of said purported transaction, Robert C. Leonard was not acting as an agent for Marcia [sic] Estates, Inc. nor did said Robert C. Leonard have any indicia of ownership of said vehicle.''

. The trial court also found that Leonard did not steal, embezzle or convert the Cadillac from *the plaintiff*.

Only three errors are assigned: (1) did the plaintiff acquire ownership of the Cadillac; (2) did the plaintiff have an insurable interest in the Cadillac; (3) are the findings supported by the evidence.

Manifestly, the solution of the controversy presented to us must turn initially upon the meaning and effect of the above quoted language of the policy, unless there be error in the findings of fact which are challenged. We then turn first to a discussion of the terms of the policy.

Laying to one side, for the moment, the paragraph dealing with newly acquired automobiles, we find the policy declares that the automobiles listed and declared in the policy are insured by the insurer in favor of the named insured on the basis of the declarations of the insured that the insured *is the sole owner* of the automobiles listed except to the extent there may be bailment leases, mortgages, or other encumbrances against some one or more of them. As there is no issue with respect to encumbrances, we lay that to one side. We are therefore concerned only with that portion of the statement reading as follows: ''the insured is the sole owner of the automobile,'' or automobiles, listed. With respect to any newly acquired automobiles, we observe again that such may be covered by the policy, (1) if *ownership* is acquired by the named insured (the plaintiff herein) and (2) if the named insured is the *owner* of the described automobile thus newly acquired and (3) if the named insured notifies the insurer within 30 days following delivery to the insured and (4) if either it replaces an automobile described in the policy or (5).

if the insurer alone was the insurer of all automobiles *owned* by the insured at such delivery date.

It will thus be seen that the named insured was, by the terms of the policy, automatically covered by the policy as to the Cadillac from the date of its delivery, *if* it was delivered; *and if* at that time the named insured was the sole owner of the Cadillac; *and if*, within 30 days, the insured had so notified the insurer. What then is meant by the phrase ''sole owner?'' The policy does not define the term.

Under such circumstances the standard used in construing a contract of insurance is the understanding of an ordinary person. (*Arenson* v. *National Automobile & Cas. Ins. Co.*, 45 Cal.2d 81, 83 [286 P.2d 816].) As it has otherwise been stated, the understanding of an ordinary person and the approved usage of words must be the guides in construing a contract of insurance. In the recent case of *Oil Base, Inc.* v. *Transport Indem. Co.*, 143 Cal.App.2d 453, 463 [299 P.2d 952] (petition for hearing denied), the court said: ''The word *owner* as applied to motor vehicles is commonly understood to designate the person in whom title is vested either as a legal owner or as a registered owner. That it was so understood by the parties here is evident from the fact that no contention was made by counsel for any of the parties at the trial of this action that the word *owner* as used in the clause of the contract in question had any other meaning.'' (Court's emphasis.)

Upon the facts as narrated it is indubitably clear that the appellant did not become an owner of the Cadillac within the purview of the terms of the policy. The continuing offer of the insurer to give coverage with respect to a newly acquired automobile attached certain conditions to be met by the insured. The burden was on the insured to comply therewith— and in the case before us to allege and prove compliance. This she has failed to do. (*Arnold* v. *American Insurance Co.*, 148 Cal. 660 [84 P. 182, 25 L.R.A.N.S. 6]; 27 Cal.Jur.2d, §§ 267 and 268.)

We come next to the question whether the appellant had an insurable interest in the Golden Goddess Cadillac at any of the times herein narrated. That such an interest is requisite is well established in this state and seemingly in every other state. Our Insurance Code, section 280, provides: ''If the insured has no insurable interest, the contract is void.'' And likewise in a comprehensive note in 9 American Law

Reports 2d 183 the editor says: "While there is little discussion now as to the necessity of the existence of an insurable interest in the insured, the question as to the nature and extent of the interest required in order to qualify as an insurable interest is still a matter of lively debate." ■ Apropos of our discussion of insurable interest is the statement in 4 Appleman, Insurance Law and Practice, 17, where he says: "Since contracts of property insurance are essentially contracts of indemnity, if no loss is suffered, there can be no recovery. And, logically, if the insured has no interest in the property, he sustains no loss by its destruction.

"It is essential that the insured have an interest, therefore, for which the contract is to indemnify him. . . . The simple rule that one cannot insure for his own benefit the property of another in which he has no interest still governs.

". . . No insurable interest existing, the contract is considered absolutely void. . . . As pointed out, the contract is, under circumstances showing no interest in the insured, purely a wager which will not be sanctioned by the courts."

■ While it is true, as appellant contends, that she in good faith paid the price of the automobile to Leonard, the interest which she achieved thereby was such interest only as Leonard had, and he had none. Hence, she never had on the evidence adduced any interest in the car as such which was insurable. What the respondents are here contending is that Mrs. Roth had no title to the Cadillac, defective or otherwise, because (1) Leonard had no title to pass to her and (2) title was in a third party, to wit, Marsha Estates, Inc.

The cases cited by appellant need no discussion as they either are not in point or are distinguishable with one exception. In the case of *Barnett* v. *London Assur. Corp.*, 138 Wash. 673 [245 P. 3, 46 A.L.R. 526], it was held that a person purchasing a stolen automobile in good faith may recover on a theft policy issued to him thereon. With respect to this case, in 4 Appleman, *supra*, under the topic "insurable interest" the following is stated: "One case even held that a person purchasing a stolen automobile in good faith may recover on a theft policy issued to him thereon." (P. 60.) In his footnote he said: "Many readers may raise the question, with justification, as to whether the court was not confused as to the true coverage of a theft policy." No general rule was laid down by Appleman as appellant would have us believe. We think the Washington court was confused and hence we cannot accept its doctrine.

Appellant's contention that the findings and conclusions are not sustained by the evidence is not well taken.

Judgment affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied April 24, 1959, and appellants' petition for a hearing by the Supreme Court was denied May 20, 1959. Peters, J., did not participate therein. Schauer, J., was of the opinion that the petition should be granted.