Filed 11/23/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ST. MARY & ST. JOHN COPTIC ORTHODOX CHURCH,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>SBC INSURANCE SERVICES, INC.,<br><br>        Defendant and Respondent. | A156085<br><br>(Alameda County<br>Super. Ct. No. RG16825041) |

This professional negligence dispute involves the interpretation of a vacancy provision in a commercial property insurance policy that states the insurer will not pay for losses resulting from specified perils if the building where the loss occurs was vacant for more than 60 consecutive days before the loss.

St. Mary & St. John Coptic Orthodox Church (St. Mary) experienced water damage 57 days after escrow closed on a residence it had purchased. St. Mary's insurance broker, SBC Insurance Services (SBC), had procured commercial property insurance for the residence with Philadelphia Indemnity Insurance Company (Philadelphia). Philadelphia denied St. Mary's claim under the policy's vacancy provision, but the parties entered into a settlement and loan receipt agreement whereby St. Mary gave Philadelphia the right to control litigation in St. Mary's name against SBC or third parties who might be liable for the loss in exchange for a loan of money to repair and

1

remediate the residence; the loan was to be repaid out of any recovery St. Mary obtained against SBC or other third parties.

Following a bench trial in St. Mary's suit against SBC for professional negligence, the court found that SBC had breached its duty of care, but that St. Mary suffered no damages because the loss was covered under the Philadelphia policy. The court found the vacancy provision to be ambiguous, and concluded that, interpreted according to the reasonable expectations of the insured, the provision did not include time before the insured owned the residence. The court also ruled that St. Mary had not satisfied its factual burden of showing the residence was vacant under the policy's definition. St. Mary challenges these findings on appeal, and we reverse the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

SBC is an insurance brokerage firm. St. Mary is a Coptic orthodox church. Wahid Tadros's parents were the driving force behind the founding of St. Mary, and Tadros served as a representative and board member of St. Mary. The Tadros family used SBC or its predecessor company to obtain insurance for their properties and businesses for decades, and, when St. Mary formed, Tadros's mother used SBC to obtain insurance for St. Mary.

### A. The Commercial Property Policy

For the time period relevant to the loss underlying this dispute, SBC procured a commercial lines insurance policy for St. Mary with Philadelphia that contained, among other things, "all-risk" coverage for property damage, effective October 26, 2014 to October 26, 2015 (the policy).

The policy is subject to the Commercial Property Conditions, Common Policy Conditions, and the applicable Loss Conditions and additional Conditions in the Commercial Property Coverage Forms. Under the "Loss

2

Conditions" section of the Commercial Property Coverage Form, the policy states:

E. Loss Conditions

    * * *

6. Vacancy

If the "building" where "loss" occurs has been vacant for more than 60 consecutive days before that "loss," we will:
a. Not pay for any "loss" caused by any of the following even if they are Covered Causes of Loss:
    * * *

(4) Water damage;

    * * *

"Buildings" are vacant when they do not contain enough business personal property to conduct customary operations.

The policy also provides that " '[b]uildings' means buildings or structures."

## B. The Purchase of the Residence

In the fall or winter of 2014, the Pope of the Coptic Church, who resides in Egypt, requested that St. Mary purchase a house to be used as his papal residence in the western United States. St. Mary also intended to use the residence to accommodate visiting bishops. St. Mary set up a committee to find a suitable residence. In April 2015, the committee asked Tadros to look at a residence on Via Di Salerno in Pleasanton, California (the residence). When Tadros viewed the residence in April 2015, it appeared empty of furnishings and contained no tables, chairs, sofas, beds, or furniture of any kind.

An April 17, 2015 appraisal report reflects the house as being vacant. Attached to the report are photographs of the residence furnished with only

3

one chair, which is consistent with the condition of the residence when Tadros viewed it.

Late on the afternoon of May 27, 2015, Tadros, who assumed responsibility for procuring insurance for the residence, called Erika Berumen, SBC's commercial account manager, to obtain insurance coverage as required by St. Mary's mortgage lender. Tadros told Berumen that St. Mary purchased a residence and needed to get insurance for the house. Berumen inquired whether the residence was for the priest to live in, and Tadros responded, "[N]o, that the house was to be used as a papal residence in the western United States, and sometimes to be used by visiting bishops." Tadros and Berumen discussed that the Coptic Pope was set to visit in October 2015. Berumen did not ask when the first visit by a bishop or priest would occur. After her call with Tadros, Berumen exercised broad discretion in procuring insurance for the residence, including placing the residence under St. Mary's existing commercial policy rather than a homeowner's policy, and she filled out and submitted an insurance application without Tadros's review.

St. Mary purchased the Via di Salerno residence following the close of escrow on May 29, 2015. Philadelphia extended coverage for the residence under the policy, effective May 28, 2015.

## C. The Loss and Coverage Denial

On July 24, 2015, Tadros learned that water was coming from the inside of the residence. He called SBC's commercial lines manager, Greg Kapphahn, to report the damage, and Kapphahn inquired about the damage to the residence and furnishings. Tadros replied that there were no furnishings, as no one was living in the residence and it was empty. Kapphahn said, "Do you mean the house was vacant?" He told Tadros there

4

may be a problem because the policy had a vacancy clause, and Tadros inquired what a vacancy clause was.

SBC reported the water damage (the loss) to Philadelphia, counting 57 days between policy inception and the date of the loss. Philadelphia denied the claim, stating the policy afforded no coverage for water damage where the residence was vacant for 60 consecutive days before the loss. St. Mary challenged the denial and also indicated that it would seek to hold SBC liable. St. Mary asserted in a letter to Philadelphia: 1) the residence was not vacant and contained enough "business personal property"—a refrigerator, range/oven, dishwasher, disposal, microwave, washer/dryer, full HVAC system, window treatments, plants, a chair, and toilet paper—to conduct customary operations of periodic visitation of clergy and to sell the home; and 2) the condition of the residence prior to St. Mary's ownership could not be considered in assessing vacancy.

Around mid-July 2016, St. Mary and Philadelphia entered into an agreement in compromise of the disputed claim. Philadelphia agreed to loan St. Mary $49,543.80 to remediate the damage to the residence, $372,215.44 to repair the residence, and $40,000 to cover loss of use of the residence, subject to the express understanding that the payments were not payments under the policy. In exchange, St. Mary consented to Philadelphia's pursuit of a lawsuit against SBC at Philadelphia's sole expense in St. Mary's name. The loan was repayable solely to the extent of any net recovery from SBC or any third party related to the loss. The loan was set to expire on June 6, 2017, but a number of months later, the parties agreed to extend the date retroactively to February 28, 2018.

### D. The Litigation and Judgment

St. Mary filed this litigation against SBC, and the case proceeded to a bench trial. Following posttrial briefing, the trial court issued a proposed statement of decision in favor of SBC. St. Mary submitted objections, which the court overruled, and the court issued a statement of decision.

The trial court found that SBC owed St. Mary a duty of care, breached that duty, and SBC's actions were a substantial factor giving rise to Philadelphia's coverage denial and damages.[1] The court found St. Mary's damages from the loss were $49,543.80 for remediation, $40,000 for loss of use, and $372,215.44 for repairs, and it found that Philadelphia had loaned this money to St. Mary.

For a number of reasons, however, the court concluded that St. Mary could not recover damages from SBC because St. Mary's claim was covered under the policy. First, the trial court found that St. Mary had not satisfied its burden to show the residence was vacant during the 60-day vacancy period. Second, the trial court found the vacancy exclusion was ambiguous as applied with respect to the 60-day vacancy period. Specifically, the court found that nothing in the vacancy provision informed St. Mary that the vacancy provision could include days that elapsed when St. Mary did not own the residence, and the reasonable expectations of the insured dictated that it could not. Thus, the court concluded that St. Mary's claim was covered under the policy. The court also rejected St. Mary's attempt to establish additional loss of use damages, finding that its evidence was too speculative and that St. Mary did not provide sufficient evidence of such damages. The court entered

---

[1] SBC does not challenge the court's findings that SBC owed St. Mary a fiduciary duty and breached that duty, so we do not provide a detailed discussion of the facts or law supporting the court's rulings on these issues.

6

judgment in favor of SBC on December 21, 2018, and St. Mary timely appealed.

## II.    DISCUSSION

St. Mary raises a number of issues in this appeal, including whether the policy's vacancy provision unambiguously counts backwards from the date of the loss, regardless of property ownership; whether the trial court erred in concluding St. Mary failed to establish vacancy for the 60 days before the loss and placed a heightened burden of proof on St. Mary; and whether St. Mary adequately established additional loss of use damages. SBC contends that St. Mary is wrong on each of the issues it raises. SBC also asserts a number of additional arguments in support of the judgment, including that the vacancy exclusion is not conspicuous; it must be applied prospectively from the date of policy issuance under California's standard form fire policy provisions, Insurance Code sections 2070 and 2071[2]; the loan receipt agreement between St. Mary and Philadelphia was actually payment under the policy and made St. Mary whole; the doctrine of superior equities bars a claim against SBC; and the loan agreement violates public policy. We address each of these arguments below.

### A. The 60-Day Period

Vacancy provisions are "premised upon the recognition that unoccupied properties face an increased risk of damage, whether from property-related crime such as theft or vandalism or from building damage or loss related to neglect." (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th

---

[2] All further statutory references are to the Insurance Code unless otherwise stated.

7

19, 22 (*TRB Investments*).)[3]  The policy here states the insurer will not pay for loss caused by water damage if the building in which the loss occurs "has been vacant for more than 60 consecutive days before that 'loss.'"  St. Mary contends that it established damages from SBC's professional negligence because this language counts backwards from the date of the loss, regardless of property ownership, and excludes the loss.  SBC counters that the loss was covered because, in calculating the 60-day time period, days during which St. Mary did not own and have an insurable interest in the residence cannot be counted.  We review de novo the question of policy interpretation posed by the parties, and well-established interpretive rules guide our review.

"'Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation.  [Citation.]  "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties.  'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation.  [Citation.]  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  [Citation.]  The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation.'"'"  (*TRB Investments*, *supra*, 40 Cal.4th at p. 27.)  Coverage clauses are interpreted broadly in favor of the insured, and exclusionary

---

[3] SBC argues the only purpose of a vacancy provision is to protect against loss caused by malfeasance, but, as the Supreme Court clearly recognized, vacant buildings also pose a risk of property damage related to neglect.

8

clauses and limitations on coverage are interpreted narrowly against the insurer. (*Ibid.*)

A policy provision will be considered ambiguous when it is capable of two or more reasonable constructions. (*TRB Investments, supra*, 40 Cal.4th at p. 27.) Contract language cannot be found ambiguous in the abstract. (*Ibid.*) Courts must consider the disputed policy language in the context of the policy as a whole, as well as "the circumstances of the case in which the claim arises and 'common sense.' " (*Nissel v. Certain Underwriters at Lloyd's of London* (1998) 62 Cal.App.4th 1103, 1112.) If the terms are ambiguous, they must be interpreted in accordance with the insured's "objectively reasonable expectations," and, if this does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.) Ambiguities in an insurance contract are generally to be resolved in favor of coverage. (*Ibid.*) However, "where the policy is clear and unequivocal, the only thing the insured may 'reasonably expect' is the coverage afforded by the plain language of the mutually agreed-upon terms." (*TIG Ins. Co. of Michigan v. Homestore, Inc.* (2006) 137 Cal.App.4th 749, 755.)

Vacancy provisions like the one at issue, which bar coverage for loss occurring in a property that is vacant for a certain period of time "before that loss or damage occurs," have been found to be clear and unambiguous in specifying that they apply retrospectively from the time of loss rather than prospectively from policy inception. In *Travelers Property Casualty Co. of America v. Superior Court* (2013) 215 Cal.App.4th 561 (*Travelers*), the court interpreted a vacancy exclusion stating, "We will not pay for any loss or damage . . . if the building where loss or damage occurs has been 'vacant' for

9

more than 60 consecutive days before that loss or damage occurs. . . ." (*Id.* at p. 575.)  There, a property investor (who had purchased the condominium developer's construction loan) submitted a claim after theft and vandalism at the vacant condominium development, and the insurer denied the claim under the policy's vacancy provision.  (*Id.* at p. 565.)  The trial court found the loss was not excluded because the 60-day period ran from the date of policy inception and 60 days had not run between the inception date and the date of the loss.  (*Id.* at pp. 575–576.)  The appellate court reversed.  Contrasting vacancy provisions that are triggered if the property is vacant " '*beyond* a period of sixty days,' " which is prospective-looking language commencing at or after policy issuance, the policy language was clearly and unambiguously backward-looking from the date of the loss, irrespective of when the policy issued.  (*Id.* at p. 576, italics added; accord *Gas Kwick, Inc. v. United Pacific Ins. Co.* (11th Cir. 1995) 58 F.3d 1536, 1539 (*Gas Kwick*).)[4]

*Travelers* and *Gas Kwick* are not on all fours, however, as neither case addressed a situation where the insured did not own the property for the full vacancy period.  Nonetheless, their interpretation of similar policy language is persuasive, as they recognize that the policy language at issue does not implicitly impose limitations not set forth in the provision.  The courts in *Travelers* and *Gas Kwick* rejected policy interpretations that would impose on

---

[4] Cases involving policies with prospective language include *Old Colony Insurance Company v. Garvey* (4th Cir. 1958) 253 F.2d 299, 300 [limitation for vacancy "beyond a period of sixty consecutive days"]; *United States Fidelity & Guaranty Company v. Board of Education of Fairfield* (N.D.Ala. 1972) 339 F.Supp. 315, 317 [same]; *Bledsoe v. Farm Bureau Mutual Insurance Co.* (Mo. App. 1960) 341 S.W.2d 626, 629 [same]; *Pappas Enterprises, Inc. v. Commerce & Industry Insurance Co.* (1996) 661 N.E.2d 81, 82 [same]; *Estate of Higgins v. Washington Mutual Fire Insurance Co.* (Pa. Super. 2003) 838 A.2d 778, 781 [same]; *Kolivera v. Hartford Fire Insurance Co.* (1972) 360, 290 N.E.2d 356 [relying on same language].

the vacancy provisions a limitation that the 60-day period commenced only at or after policy issuance. (*Travelers, supra,* 215 Cal.App.4th at p. 576 ["there is no limitation in the [vacancy] clause" stating that the 60-day period "must commence at or after policy inception"]; *Gas Kwick, supra,* 58 F.3d at p. 1538 [vacancy provision excluded coverage where property was vacant for more than 60 days "*before* that loss or damage"; rejecting insured's argument that provision was limited to period running after policy inception date].) In this case, SBC asserts that the vacancy provision is limited such that the 60-day period commences only upon the insured's ownership of the property. But the policy language does not contemplate or impose such a limitation, instead excluding coverage for losses resulting from water damage "[i]f the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs." When a loss occurs, the sole inquiry is whether the building has been vacant for the prior 60 consecutive days. This language unambiguously counts backwards without regard to ownership. (See *West Bend Mutual Ins. Co.* v. *New Packing Co.* (Nov. 30, 2012, Ill. App. Ct., No. 1–11–1507) 2012 Ill. App. Unpub. Lexis 2908, **15–17 [vacancy provision denying coverage for certain perils where building was vacant more than "60 consecutive days before that loss or damage occurs" clearly counted backwards and included days the building sat vacant in

11

escrow; however, insurer with the opportunity to inspect the building could not rely on the vacancy provision].)[5]

Contrary to SBC's position, this interpretation of the policy does not violate the insurable interest requirement of section 280. Under that statute, "If the insured has no insurable interest, the contract is void." " 'The simple rule that one cannot insure for his own benefit the property of another in which he has no interest still governs.' " (*Napavale, Inc. v. United Nat's Indem. Co.* (1959) 169 Cal.App.2d 119, 124.) However, the Insurance Code clearly sets forth that an insurable interest in property "must exist when the insurance takes effect, and when the loss occurs, but need not exist in the meantime." (§ 286.) These requirements were satisfied here.

We also reject SBC's argument that sections 2070 and 2071 require the 60-day vacancy period to apply prospectively from the policy's inception date. Section 2071 provides a standard form for fire policies in California, and states in relevant part, "Conditions suspending or restricting insurance[:] [¶] Unless otherwise provided in writing added hereto this company shall not be liable for loss occurring . . . while a described building, whether intended for

---

[5] We requested supplemental briefing on whether the policy's "control of property" condition affects the interpretation of the vacancy provision. The "control of property" provision states, "[a]ny act or neglect of any person other than you beyond your direction or control will not affect this insurance." While we may affirm a judgment on any legal basis, St. Mary's supplemental briefing pointed out that the parties' purchase agreement and escrow instructions may bear on the question of control, and these documents were not before the trial court. Because the factual issues of "direction and control" under the "control of property" provision were not raised below, our request appears to implicate a factual situation open to controversy of which the parties were not on full notice. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2001) § 8:240.) We therefore decline to consider this issue.

12

occupancy by owner or tenant, is vacant or unoccupied beyond a period of 60 consecutive days . . . ." Section 2070 states that "all fire policies on subject matter in California shall be on the standard form," and "[n]o part of the standard form shall be omitted therefrom except that any policy providing coverage against the peril of fire only, or in combination with coverage against other perils, need not comply with the provisions of the standard form of fire insurance policy . . . *provided, that coverage with respect to the peril of fire*, when viewed in its entirety, is substantially equivalent to or more favorable to the insured than that contained in such standard form fire insurance policy." (italics added.) The loss here resulted from water damage, so section 2070's requirement that coverage "with respect to the peril of fire" be substantially equivalent or more favorable than the provisions of the standard form fire insurance policy is inapplicable.

## B. The Residence Was Vacant During the 60-Day Period

Under the policy, " 'buildings' are vacant when they do not contain enough business personal property to conduct customary operations." The trial court found that "business personal property" and "customary operations" should have been defined if the insurer intended to rely on their plain meaning. It criticized Philadelphia's coverage position that the residence would need to look like a normal furnished residence and stated that whether the residence contained enough business personal property to conduct customary operations depended on the residence's intended use as a residence for visiting clergy. With respect to the three days before escrow closed, the trial court found that St. Mary did not produce evidence showing the residence's condition or its customary operations. The court cited Tadros's testimony that he did not know whether anyone moved items in and out of the residence before escrow closed, and testimony from another witness

13

that Philadelphia did not contact the seller to inquire about the condition of the residence in these days. The court also found that the residence was not vacant during this time because its customary operations were that of a residence for sale. Finally, the court relied on admissions by St. Mary in a coverage dispute letter to the effect that the residence contained sufficient business personal property such that it was not "vacant" before and after the close of escrow. For those reasons, the trial court concluded that St. Mary did not carry its burden of proof to show the residence was vacant as defined by the policy.

In a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*In re I. W.* (2009) 180 Cal.App.4th 1517, 1528; *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.) Instead, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I. W.*, at p. 1528.) Specifically, we ask "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Ibid.*) St. Mary contends that the trial court erred, and the evidence compels the conclusion that the residence did not contain enough personal property to conduct operations as a residence in the western United States for the Coptic Pope and visiting clergy or the prior owner. We agree.

## 1. Policy Interpretation

St. Mary argues the policy's definition of a vacant building is clear and unambiguous.  SBC argues generally that the vacancy provision is ambiguous, but SBC does not offer an alternative construction of "vacant" other than a brief assertion for the first time on appeal that the provision does not apply to residences.[6]  The vacancy provision suspends coverage for loss due to water damage "[i]f the 'building' where 'loss' occurs has been vacant for more than 60 consecutive days before that 'loss' . . . ."  Under the policy, " '[b]uildings' " are defined as "buildings and structures."  As residences are a type of building, the total exclusion of residences would defy the policy's plain meaning.

Many courts have found that provisions defining vacancy by whether a building was used to conduct "customary operations" are unambiguous when interpreted in context, and have likewise found that the term "customary operations" refers to the customary operations for which a property was insured or those of a lessee who operates at the property.  In *Imperial Beach Palm, LLC v. Travelers Property Casualty Company of America* (S.D. Cal. July 8, 2015, No. 14CV639) 2015 WL 11401349 at *3, for example, where a building was "vacant" unless at least 31 percent of its total square footage was "rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations," and "customary operations" was not

---

[6] SBC makes this brief assertion in the midst of arguing that St. Mary did not carry its burden to show vacancy for 60 days, but it goes on to apply the policy definition in arguing that St. Mary did not show the residence lacked "enough business personal property to conduct customary operations." SBC argued below that the policy definition applied, and St. Mary failed to show the residence lacked sufficient business personal property to conduct St. Mary's customary operations and the customary operations as a residence for sale.

defined, the court looked to the ordinary meaning.  (*Id.* at \*\*2–3.)
" 'Customary' " meant " 'commonly practiced, used, or observed,' " and
" '[o]perations' " meant " 'an activity of a business or organization.' "  (*Id.*
at \*3.)  Where the property was insured for "mercantile use" and the lessee
sold shellfish traps and fishing equipment, the term "customary operations"
meant the lessee's customary business activities.  (*Ibid.*)

In *Keren Habinyon Hachudosh D'Rabeinu Yoel v. Philadelphia
Indemnity Ins. Co* (2nd Cir. 2012) 462 Fed. Appx. 70, 72, a building was
"vacant" "unless at least 31 percent of its total square footage [was] . . . [u]sed
by the building owner to conduct customary operations."  The policy did not
define "customary operations," but the court concluded that, where the
insured operated a school, the term "customary operations" could only refer to
the commonly practiced activity of operating a school.  (*Id.* at p. 73.)  A one-
day event during the vacancy period where 25 teachers met while students
played on the roof did not constitute "customary operations" of the insured.
(*Ibid;* see also *Saiz v. Charter Oak Fire Ins. Co.* (10th Cir. 2008) 299 Fed.
Appx. 836, 839–840 [use of a basement office did not constitute "customary
operations" at a building insured as a restaurant].)

As applied, the terms "customary operations" and "business personal
property" were not ambiguous merely because the policy did not define them.
(See *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993)
5 Cal.4th 854, 866 [term that was undefined was not necessarily ambiguous];
*Brown v. Mid-Century Ins. Co.* (2013) 215 Cal.App.4th 841, 858 [undefined
term did not render a policy unclear].)  St. Mary was insured as a religious
organization, and it planned to use the "building" where the loss occurred as
a residence for the Coptic Pope in the western United States and for visiting
clergy.  Thus, the residence was vacant if it lacked sufficient personal

property to conduct operations as a residence for the Coptic Pope and for these clergy. Further, for the three days before escrow closed, the residence was vacant if it did not contain enough personal property to operate in accordance with its customary use as a residence.[7]

With respect to the 58th, 59th, and 60th days before the loss, we reject the trial court's interpretation that the residence was not vacant because its customary operations were that of a residence for sale rather than a normal residence. On this issue, we find the out-of-state authorities cited by St. Mary persuasive. In *Oakdale Mall Assocs. v. Cincinnati Ins. Co.* (8th Cir. 2012) 702 F.3d 1119, 1121, the insured suffered a loss at a shopping mall it owned, and the insurer denied coverage due to a vacancy provision. (*Ibid.*) The mall was deemed vacant unless at least 31 percent of its total square footage was "rented to a lessee or sub-lessee and used by them to conduct their customary operations; or used by the building owner to conduct customary operations." (*Ibid.*) At the time of the loss at issue, the mall had only four tenants open for business occupying less than 31 percent of its

---

[7] Even if the policy's definition of "vacant" does not apply to the specific factual situation covering the three days before close of escrow, under the plain meaning of the word, a residence that is almost entirely empty with the exception of certain appliances, one chair, some window treatments, and toilet paper is vacant. (See *Travelers*, *supra*, 215 Cal.App.4th at p. 577, fn. 18 [stating that the court would have applied the plain meaning of "vacant" to find an unoccupied condominium complex to be vacant if the policy's vacancy definition did not apply to the facts of the case]; *Foley v. Sonoma County Mutual Fire Ins. Co.* (1941) 18 Cal.2d 232, 234 [under a clause excluding coverage for fire losses where a building was "vacant or unoccupied," "vacant" is associated with lack of inanimate objects and "unoccupied" is associated with abandonment of a dwelling as a customary abode]; Merriam-Webster Online Dictionary <https://www.merriam-webster.com/dictionary/vacant> [as of November 20, 2020] ["vacant" means "being without content or occupant"]; see *infra,* section II(B)(2).)

square footage.  (*Id.* at p. 1122.)  Nonetheless, the insured owner argued that because it was actively seeking tenants to occupy the space and had posted a "for lease" sign, it was using the property "to conduct normal business operations."  (*Id.* at p. 1124.)  The court rejected this argument, explaining that if it were accepted, a mall that was completely vacant with a large sign outside saying "for lease" would be deemed not vacant, which would be an absurd result.  (*Ibid.*; see also *7th & Allen Equities v. Hartford Cas. Ins. Co.* (E.D. Pa. Nov. 2, 2012, No. 11–cv–01567) 2012 WL 5392167 *6 [insured did not conduct its customary operations of leasing buildings at the property; merely showing the property to prospective tenants does not establish the insured's use for its customary operations]; *Travelers*, *supra*, 215 Cal.App.4th at p. 577, fn. 19 [although a building's units were offered for sale, "customary operations" were not being conducted at the building where no one engaged in the business of selling units from within the building].)

In *Sorema North American Reinsurance Co. v. Johnson* (2002) 258 Ga. App. 304, 305–306, the insured, a company engaged in lending, asset management, marketing, and liquidation, suffered a loss at a building the insurer determined was vacant under a provision stating a building is "vacant when 70 percent or more of its square footage:  (i) [i]s not rented; or (ii) [i]s not used to conduct customary operations."  The insured had purchased the building at a foreclosure sale and had begun selling off the inventory left by the prior owner and marketing the building for sale.  (*Ibid.*) Recognizing that the vacancy exclusion was "intended to protect the insurer from the higher risk of loss associated with property that is not attended," the court rejected the argument that the property was not vacant because the insured used it as an asset in the insured's asset management operations. (*Id.* at p. 306.)  As did the courts in these cases, we reject the contention that

18

the residence was not vacant under the policy because it was being held out for sale.

## 2. Application of Policy to Evidence at Trial

We next analyze whether the trial court erred in its determination that St. Mary did not carry its burden of proving that the residence was vacant in light of the policy definition and the facts presented at trial. On the question of what constitutes sufficient personal property to operate a building as a residence, *Belgrade v. National American Ins. Co.* (1962) 204 Cal.App.2d 44 is instructive. Under the policy there, loss caused by certain perils was not covered if the property was vacant more than thirty days preceding the loss, and "[a] building intended for residence by human beings shall be deemed to be vacant within the meaning of this policy unless such building contains the furnishings ordinarily contained therein to enable the use of said building for the purpose for which it is adapted . . . ." (*Id.* at pp. 45–46.) The loss occurred in a two-story, ten-room house listed for sale. (*Id.* at p. 46.) The house contained a chaise lounge, two mattresses on the floor, sheets, pillow cases and pillows, six blankets, two suits, shirts, underwear, bath towels, hand towels, toiletries, toothbrushes, dental floss, soap, a breakfast room table and four chairs, a kitchen stool, a captain's chair, a folding chair, pots, pans, an electric hot plate, a built-in soda fountain, silverware, plates, cups, glasses, dishes, a radio, a vacuum cleaner, dust mops, brooms, brushes and garden implements. (*Ibid.*) All utilities and phones were connected, and the owners were in the home as early as 8 a.m. and left as late as midnight. (*Ibid.*) The trial court found that the premises were vacant within the policy's meaning because "the dwelling . . . did not contain furnishings ordinarily contained in such a building to enable the use of said building . . . as a place of " 'residence by human beings.' " (*Id.* at p. 47.) The

19

appellate court affirmed, stating, "In view of the evidence . . . of how sparsely the house was furnished, it is obvious that the record amply supports such determination of the trial court." (*Ibid.*)

On the undisputed evidence presented at trial, the residence here did not contain enough personal property to operate as a residence for the Coptic Pope in the western United States and for visiting clergy. With the exception of a single chair, the multiple-room residence was entirely unfurnished. There were some appliances, an HVAC system, some window treatments, a plant, and toilet paper, but these limited items were not sufficient to operate the building as a residence even for those who would only stay there temporarily. (Cf. *Hehemann v. Michigan Millers Mut. Ins. Co.* (Ct. App. Fl. 1970) 240 So.2d 851, 853–854 [concluding as a matter of law that a house with only drapes and built-in kitchen appliances was vacant under a homeowner's policy that did not define the term]; *American Mut. Fire Ins. Co. v. Durrence* (11th Cir. 1989) 872 F.2d 378, 378–379 [home that was empty except for a refrigerator, stove, washing machine, and a table "lacked amenities minimally necessary for human habitation" and was vacant as a matter of law under a home insurance policy that did not define the term].)

Regarding the 58th, 59th, and 60th days before the loss, while St. Mary did not produce direct evidence of the residence's condition during these days or testimony from the seller regarding his or her customary use of the property, the evidence compels a finding that it was more likely than not the residence was customarily used as a residence, and it was vacant—in other words, it did not contain enough personal property to operate as a residence—during those three days. (*Masellis v. Law Office of Leslie F. Jensen* (2020) 50 Cal.App.5th 1077, 1093 [the preponderance of the evidence standard requires proof that something is "more likely than not"].)

Uncontradicted evidence established that the building was a residence. The residence had been up for sale before Tadros visited it in early April 2015. Tadros testified that during his visit, the residence was empty of furniture and it would have been apparent to someone looking in the windows that no one lived there.

St. Mary purchased the residence following an escrow period. The April 17, 2015 appraisal report for the residence and photographs attached thereto reflect that, with the exception of a refrigerator, range/oven, dishwasher, disposal, microwave, washer/dryer, an HVAC system, one chair, some window treatments, plants, and toilet paper, the residence was empty and unfurnished. Tadros confirmed that the appraisal photographs reflected the condition of the residence when he viewed it. Further, the three days at issue were the last three days before close of escrow, and the court acknowledged that sellers typically remove any furnishings they may have in a house before close of escrow. This uncontroverted evidence is sufficient to compel the conclusion that it is more likely than not the property was customarily used as a residence and its condition three days before escrow closed was as reflected in the appraisal report. The residence lacked enough personal property to function as a residence and St. Mary was therefore entitled to a finding that the property was vacant. (*In re I.W., supra,* 180 Cal.App.4th at p. 1528.)

The letter St. Mary wrote to Philadelphia during their coverage dispute does not change our conclusion. Out of court admissions of fact by a party are admissible against that party. (Evid. Code, § 1220.) St. Mary admits in the letter that, during the relevant period, the residence was as portrayed in the April 2015 appraisal report with a refrigerator, range/oven, dishwasher, disposal, microwave, washer/dryer, an HVAC system, a chair, window

21

treatments, plants, and toilet paper. The letter goes on to assert the residence was not vacant for the three days before escrow closed because this personal property was sufficient to conduct the customary operations of the prior owner to sell the residence, conceding that if the customary operations were a full-time residence, Philadelphia may have an argument for vacancy. The letter also asserts the personal property in the residence was sufficient to conduct St. Mary's customary operations as a residence for visiting clergy because it was everything a visitor may need. The statements in the letter must be construed in light of the facts admitted as to the items of property in the residence. Items such as the chair and appliances were undisputedly present, but regardless of St. Mary's contentions in its letter seeking coverage, their presence does not show the residence contained sufficient personal property to operate as a residence, for visitors or full-time residents.

## C. The Vacancy Provision Was Sufficiently Conspicuous

To be enforceable, any insurance provision that takes away or limits coverage reasonably expected by an insured must be " 'conspicuous, plain and clear.' " (*Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 (*Haynes*).) Citing *Haynes*, SBC argues that the vacancy provision violates this rule because of its location in the commercial insurance policy as a whole. Whether an exclusion or limitation is "conspicuous, plain and clear" is a question of law. (*Sprinkles v. Associated Indemnity Corp.* (2010) 188 Cal.App.4th 69, 77; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2020) ¶ 4:491.)

In *Haynes*, a provision limiting coverage for permissive automobile users was not conspicuous where it appeared in an endorsement on the 24th page of the policy, and where the declarations page showed much higher limits and listed endorsements only by an alphanumeric sequence with no

explanation as to their subject matter.  (*Haynes*, *supra*, 32 Cal.4th at pp. 1202–1204.)  The policy's definition of "insured" at the outset of the liability section indicated that permissive users were included.  (*Id*. at p. 1208.)  The endorsement at issue (denominated "S9064") modified language that appeared earlier in the policy under the heading "Other Insurance."  (*Id*. at p. 1203.)  The Supreme Court found that the heading "Other Insurance" did nothing to alert the reader that it limited permissive user coverage, and further noted that there was nothing in the section that attracted a reader's attention to the limiting language.  (*Id*. at p. 1205.)  Nor was the limitation in endorsement S9064 set forth in a manner that would attract the reader's attention; instead, it was on the 24th page of the policy, buried in 19 lines of fine print, surrounded by language that had nothing to do with exclusions or limitations.  (*Id*. at p. 1206.)

The vacancy provision here does not suffer from the same deficiencies. The policy consists of multiple coverage parts.  The forms that comprise the commercial property coverage part are listed after the commercial property declarations, including the "Commercial Property Conditions" and the "Property Coverage Form."  The "Commercial Property Conditions" form begins, "This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in the Commercial Property Coverage Forms."  A few pages later, the Property Coverage Form begins and states, "Various provisions in this policy restrict coverage.  Read this entire policy carefully to determine rights, duties, and what is and is not covered."  Section A of the Property Coverage Form sets forth "Coverage," and Section E sets forth the "Loss Conditions" in bold font.  Each "loss condition," including "Vacancy," is in bold font, and the size of the font and spacing is consistent throughout.  Unlike the provisions

in *Haynes,* this language is sufficiently conspicuous to be enforceable as a limitation on coverage.

In sum, we find that when the vacancy provision is properly interpreted and applied to the undisputed evidence at trial, there was no coverage for the loss under the policy.

### D. The Loan Receipt Agreement

As SBC does not dispute the trial court's finding that it breached its duty to St. Mary, and in light of our determination that there was no coverage for this loss due to the vacancy provision, we turn next to SBC's argument that the loan receipt agreement between Philadelphia and St. Mary bars recovery against SBC.

As previously discussed, Philadelphia and St. Mary entered into a loan receipt agreement whereby the parties agreed to compromise St. Mary's claim on the following terms: Philadelphia loaned St. Mary $461,759.24 subject to the understanding the loan was not payment under the policy; St. Mary allowed Philadelphia to pursue a lawsuit against SBC at Philadelphia's sole expense in St. Mary's name; and the loan was repayable solely to the extent of any net recovery against SBC or any third party related to St. Mary's loss. SBC argues that the doctrine of superior equities in *Meyers v. Bank of America* (1938) 11 Cal.2d 92 (*Meyers*) and *American Alliance Ins. Co. v. Capital Nat. Bank of Sacramento* (1946) 75 Cal.App.2d 787 (*American Alliance*) prohibit this loan agreement and bar St. Mary or Philadelphia from recovering against SBC.[8] We disagree.

---

[8] We requested supplemental briefing regarding what remedy would be appropriate if we determined the loan receipt agreement to be invalid. To the extent SBC used this briefing to reargue the invalidity of the loan receipt agreement, we disregard these arguments.

24

Loan receipt agreements gained recognition in the admiralty case of *Luckenbach v. W. J. McCahan Sugar Refining Co.* (1918) 248 U.S. 139. There, a shipper transported goods with a carrier under a bill of lading that provided the carrier would have the benefit of insurance effected by the shipper on the property. (*Id.* at pp. 144–146.) The shipper obtained insurance, but the policy exempted the insurer from liability for damage for which the carrier might be liable. (*Id.* at p. 146.) The insurer was thus liable contingently—it would have incurred liability to the shipper only after it was determined that recovery against the carrier was impossible. (*Ibid.*) Furthermore, if the insurer had paid the shipper before the carrier's liability was determined, the carrier would not have been liable to anyone. (*Id.* at pp. 146–147.) In order to preserve its rights against the carrier and to secure prompt payment to the shipper for the goods damaged during transport, the insurer and shipper resorted to a loan receipt agreement that the United States Supreme Court upheld as a valid loan that was "consonant both with the needs of commerce and the demands of justice." (*Id.* at pp. 148–149.) Since *Luckenbach*, this type of agreement has been upheld where the liability of the insurer who advances the money was not absolute and was in any way contingent, conditional, excess, or undetermined. (16 Couch on Insurance (3d. ed. June 2020 Update) § 222.85.)

In *Meyers*, *supra*, 11 Cal.2d 92, a loan receipt agreement was not at issue, and our Supreme Court addressed the doctrine of equitable subrogation whereby an insurer who has paid an insured on a loss caused by a third party is permitted to pursue its insured's rights and remedies against that party. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2020) ¶ 9:2.) The Supreme Court held that an indemnitor who reimburses his indemnitee for a loss resulting from the negotiation of forged

checks by the indemnitee's employee has no right of recovery from the innocent bank that honored the forged checks. (*Meyers*, at pp. 102–103.) The rationale of *Meyers* is as follows: An indemnitor has a contractual liability to reimburse his indemnitee for the latter's losses; although a bank that pays out a depositor's funds based on forged checks is liable to the depositor, the depositor's indemnitor will not be subrogated to the rights of the depositor against the bank because subrogation is an equitable doctrine and the equities of the indemnitor are no greater than the equities of the bank that innocently paid out funds on a forged signature. (*Id.* at pp. 102–103.)

In *American Alliance*, *supra*, 75 Cal.App.2d 787, the plaintiff's employee forged checks that the defendant bank honored. Thereafter, the plaintiff's indemnitor, a bonding company, reimbursed the plaintiff for its losses on demand and took from the plaintiff a loan receipt agreement. (*Id.* at pp. 789–790.) The appellate court determined that the agreement was a mere sham in the circumstances where the surety's liability was absolute, and the money was in fact paid to the plaintiff in discharge of its liability under the bonding company's fidelity bond. (*Id.* at p. 796.) The court therefore held: (1) the plaintiff had no right of recovery against the defendant bank on its own account, for that would constitute double recovery; and (2) the plaintiff could not recover on behalf of the bonding company because, under *Meyers*, the bonding company had no enforceable right of subrogation against the bank. (*Id.* at pp. 797–798.)

In contrast, *Traner v. Crocker Anglo Nat'l Bank* (1959) 173 Cal.App.2d 779, 782–783 (*Traner*) upheld use of a loan receipt agreement, finding that it was not invalid under *Meyers* and *American Alliance*. The plaintiff in *Traner* was the president of a company whose employee forged the plaintiff's signature on a $3,500 check drawn on the plaintiff's individual account. (*Id.*

26

at pp. 779–780.)  The defendant bank honored the check, the plaintiff demanded a credit, and the defendant refused.  (*Id.* at p. 780.)  The plaintiff then demanded a surety indemnify his loss, but the surety denied this request because the sole obligee under its bond was the plaintiff's company.  (*Ibid.*)  However, the surety advanced $3,500 to the plaintiff, who executed a "Loan Receipt."  (*Ibid.*)  The loan receipt documented a loan without interest, repayable only in the event and to the extent of any net recovery the plaintiff may make from any person or entity in connection with the forged check.  (*Ibid.*)  The plaintiff agreed to cooperate with the surety and to prosecute suits against potentially liable parties in his name at the surety's expense and control.  (*Id.* at pp. 780–781.)  The plaintiff sued the defendant bank, and the court granted summary judgment for the defendant.  (*Id.* at p. 781.)

On the plaintiff's appeal, the defendant relied on *Meyers* and *American Alliance* to argue the loan was not a loan and was instead reimbursement for the plaintiff's loss, and the plaintiff was thereby precluded from recovering $3,500 from the defendant.  (*Traner*, *supra*, 173 Cal.App.2d at pp. 781–782.)  The court reversed, finding the evidence did not show the existence of an obligation of the surety to reimburse the plaintiff for his loss and that there was no reason to refuse to recognize the transaction as a loan and deny the plaintiff the right to pursue remedies against the defendant.  (*Id.* at p. 783.)  The court distinguished the situation before it—where no absolute obligation had been established—with those in *Meyers* and *American Alliance* where the indemnitors had absolute, contractual obligations to make good the indemnitees' losses.  (*Id.* at p. 782.)

*Heuer v. Truck Ins. Exchange* (1942) 51 Cal.App.2d 497 (*Heuer*) also upheld a loan receipt agreement.  There, a driver operated a trucking company and obtained insurance from the defendant with a provision

allowing third parties to proceed against the defendant after obtaining a personal injury judgment against the driver. (*Id.* at pp. 498–499.) With seven days' notice, the defendant informed the driver that the policy would cancel at the end of April 1938. (*Id.* at p. 499.) The driver hit the decedent after the cancellation notice but before the end of April, and the defendant claimed the policy had been cancelled. (*Id.* at pp. 499–500.) Meanwhile, before the accident occurred but after the cancellation notice, the driver obtained a second insurance policy from New York Casualty Company. (*Id.* at p. 500.) New York Casualty declared its policy void because of a misrepresentation by the driver's agent in procuring the policy. (*Ibid.*)

The decedent's heirs sued the driver and recovered a $3,500 judgment. (*Heuer*, *supra*, 51 Cal.App.2d at p. 498.) New York Casualty, which defended the driver and reserved its rights, entered into a loan receipt transaction with the heirs with terms similar to the agreement here. (*Id.* at p. 501.) New York Casualty disclaimed liability under its policy, and, for $1,750, the heirs released it from all claims; in the event the heirs recovered any sum under the judgment in excess of $1,750 from any third party other than the driver, the heirs agreed to repay New York Casualty an amount equal to the excess but in no event more than $1,750 with interest. (*Id.* at pp. 501–502.)

The heirs then sued the defendant. (*Heuer*, *supra*, 51 Cal.App.2d at pp. 500–501.) After a bench trial, the court found that the defendant's policy had not been cancelled; the driver was negligent; the heirs had recovered a final judgment against the driver that had not been satisfied in whole or in part by the loan made by New York Casualty; New York Casualty's policy was void from inception due to misrepresentation; the defendant was liable to the heirs for the judgment; and the heirs were the real parties in interest. (*Id.* at p. 502.) On appeal, the appellate court rejected the defendant's attack

28

on the loan receipt transaction, recognizing it as a valid loan and not a legal subterfuge. (*Id.* at pp. 503–504.) In doing so, the court distinguished out-of-state cases rejecting loan receipt agreements where the insurer's liability to the insured was absolute when the loss occurred. (*Id.* at p. 504.) Because New York Casualty's policy had been found void and unenforceable, "[t]here was obviously no liability, absolute or otherwise, upon said company as in the cases cited by defendant." (*Ibid.*)

This case is more like *Traner* and *Heuer* than *American Alliance*. We have determined St. Mary's loss was not covered because of the vacancy provision, and the trial court's determination that SBC was negligent stands. Thus, Philadelphia did not have an absolute contractual liability to St. Mary and could enter into the loan receipt agreement without committing a legal subterfuge. And because it was not a legal sham for payment of an undisputed obligation under the policy, the agreement did not prevent St. Mary from pursuing recovery against SBC. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2020) ¶ 9:55; *Traner*, *supra*, 173 Cal.App.2d at p. 783.)

Citing *American Alliance*, *supra*, 75 Cal.App.2d 787, SBC also argues the loan receipt agreement violates public policy because an insurer of a covered loss may not pay an insured's claim and then litigate a professional negligence claim against a broker for procuring insurance that covered the loss. But in *American Alliance*, the surety's liability for the loss was absolute. (*American Alliance*, at p. 796.) Here, St. Mary's loss was not covered because of the vacancy provision and SBC was negligent, so the factual premise of SBC's public policy argument fails.

Finally, SBC briefly asserts that the loan receipt agreement is invalid because St. Mary had no obligation to repay the loan and the parties'

extension of the agreement was invalid for lack of consideration. But under the loan receipt agreement, St. Mary had an obligation to repay the loan should it recover against SBC. The loan receipt agreement also states, "Any obligation to pay the Loan shall expire as of June 6, 2017. If Philadelphia has been diligently pursuing SBC for repayment, then Saint Mary will provide a reasonable extension of the obligation to pay the Loan." The parties thus bargained for the extension as part of the consideration exchanged in the original agreement.

### E. Additional Loss of Use Damages

St. Mary briefly argues that the trial court erred in denying its claim for an additional $113,750 for the loss of use of the residence for 17 to 18 months, as calculated by the residence's purported fair market rental value. The trial court did not err.

Tadros testified that remediation on the residence took one month and the repairs took four to five months to complete, but the repairs did not start for approximately 12 months because St. Mary did not have the funds to make the repairs. With respect to rental value, St. Mary's counsel asked, "Now, do you have an idea or understanding as to what the fair rental value is for the Via Di Salerno house?" Tadros replied, "Yes. I would say it's about five to eight thousand a month. In that range." Counsel continued, "And on what basis do you have an understanding that the fair rental value of the Via Di Salerno house was five to eight thousand dollars a month?" Tadros responded, "I have some rental properties nearby, and I live in the neighborhood. So I have a feel for what things go for around there, what a house that size in that neighborhood would go for."

The trial court did not err in finding that Tadros's testimony was too speculative to support an award of damages. Although Tadros testified at the

time of the 2018 trial that he lived in the same neighborhood as the residence, this testimony did not establish his knowledge of the rental values in that neighborhood, or that he had rental property in that neighborhood during the 2015 to 2016 time period relevant to St. Mary's damages. Tadros further vaguely testified that his rental properties were "nearby," but St. Mary does not cite evidence establishing where these rental properties were located or that Tadros's home or rentals were comparable to the residence.

*Meyer v. Benko* (1976) 55 Cal.App.3d 937 (*Meyer*), which St. Mary cites for the first time in its reply brief, supports the ruling below. There, the court reversed a judgment for a property seller after the trial court found the parties did not have a contract, and the appellate court discussed remedies on remand. (*Id.* at pp. 942, 947.) The court found the buyer could recover loss of use damage measured by the fair market rental value of the property although it was not income-producing. (*Id.* at p. 946.) However, "the only evidence introduced concerning the fair rental value of [the] property was the testimony of [the buyer as the equitable owner] who testified that he believed the rental value was $300 a month." (*Ibid.*) This testimony apparently related to the rental value of the property at the time of trial, and, because rental values may fluctuate tremendously, the court stated the rental value should be assessed over the entire time of loss of use. (*Ibid.*) Even assuming the remedy in *Meyer* is available in this case, as in *Meyer*, Tadros's testimony appears to refer to the rental value of the residence at the time of trial, but St. Mary had resumed use of the residence by then.

### III.   DISPOSITION

The judgment is reversed, and the matter is remanded with directions to enter judgment in favor of St. Mary for $461,759.24.

BROWN, J.

WE CONCUR:

POLLAK, P. J.

STREETER, J.

*St. Mary & St. John Coptic Orthodox Church v. SBC Insurance Services* (A156085)

Trial Court:Alameda County Superior Court

Trial Judge:        Hon. Paul D. Herbert

Counsel:

Cummins & White, LLP, Larry M. Arnold, Margaret R. Miglietta, for Plaintiff and Appellant.

Stone & Associates, APC, Colette F. Stone, Juliet M. Lompa; Hayes, Scott, Bonino, Ellingson, Guslani, Simonson & Clause, LLP, Mark G. Bonino, Emma B. Lloyd, for Defendant and Respondent.